FILED

JAN 0 5 2004

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SCOTT MCSPARRAN, Derivatively On Behalf of CAREER EDUCATION CORPORATION,<br><br>                     Plaintiff,<br><br>          vs.<br><br>JOHN M. LARSON, PATRICK K. PESCH, WALLACE O. LAUB, KEITH K. OGATA, DENNIS H. CHOOKASZIAN, ROBERT E. DOWDELL, THOMAS B. LALLY, NICK FLUGE, JACOB P. GRUVER and TODD H. STEELE,<br><br>                     Defendants,<br><br>          - and -<br><br>CAREER EDUCATION CORPORATION, a Delaware corporation,<br><br>                     Nominal Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

04C 0041

JUDGE ANDERSEN

No.

MAGISTRATE JUDGE LEVIN

DEMAND FOR JURY TRIAL

JAN - 6 2004

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF
FIDUCIARY DUTY, ABUSE OF CONTROL, GROSS MISMANAGEMENT, WASTE OF
CORPORATE ASSETS, UNJUST ENRICHMENT AND FOR BREACH OF FIDUCIARY
DUTIES FOR INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION**

1-1

# INTRODUCTION

1.     This is a shareholder derivative action brought in the right of, and for the benefit of, nominal defendant Career Education Corporation ("CEC" or the "Company") against its Board of Directors (the "Board") and top officers to remedy defendants' breaches of fiduciary duties and other violations of law which have inflicted millions of dollars in damages upon CEC's reputation, goodwill and standing in the business community and have exposed it to millions of dollars in potential liability for violations of state and federal law.

2.     CEC operates private, for-profit post-secondary education institutions and trade schools. This action arises out of defendants forcing (or failing to prevent others from forcing) the Company's employees to falsify admission records to fraudulently obtain accreditation and to inflate revenues, and to falsify academic records to manipulate post-graduation employment statistics. As a result of these machinations, defendants also caused and/or permitted CEC to report improper financial results to the Securities and Exchange Commission ("SEC") and the investing public between January 28, 2003 and December 3, 2003 (the "Relevant Period"). Defendants' misconduct has caused severe, irreparable injury and damages to the Company, particularly to its reputation and goodwill in the investment and business community, has exposed the Company to millions of dollars in potential liability for violations of state and federal law, has caused the Company to lose more than $2 billion in market capitalization, and threatens to virtually destroy this once valuable franchise.

# SUMMARY OF THE ACTION

3.     CEC is a provider of private, for-profit post-secondary education, with fifty-one

campuses located throughout the United States, Canada, France, the United Kingdom and the United Arab Emirates. CEC also offers online programs through American InterContinental University-Online, its e-learning division. The Company's schools offer master's degrees, bachelor's degrees, associate's degrees and diploma programs in career-oriented disciplines.

4.     CEC's business is highly regulated by federal, state and private accrediting agencies, including the Accrediting Council for Independent Colleges and Schools ("ACICS") and is crucially dependent on maintaining compliance with federal and state rules, and its accreditation and reputation with students and employers.

5.     Because companies like CEC rely on government student aid for a large portion of its tuition and fees, they come under very close scrutiny and are heavily regulated. High default rates in the 1980s led to increased attention to the issue. Defendants' illegal and unethical practices to inflate income and enrollment will subject CEC to more scrutiny from regional accreditation agencies and the federal government which provides the student loans, grants and aid that supply the Company's lifeblood. Defendants were made aware of these employees' complaints throughout the Relevant Period, well before they first emerged in media reports, but perilously concealed them to continue their ruse. One of the schools, the Brooks Institute of Photography, now faces losing its accreditation which will severely diminish the asset's income producing potential and put the rest of the Company's schools under increased scrutiny.

6.     In fact, the Company has faced intense scrutiny since its inception. Four of CEC's seven directors previously worked at National Education Corporation ("NEC"). In 1989, the U.S Department of Education ("DOE") reigned down on NEC, charging it with providing little education, and maintaining minimal screening of applicants, resulting in a 63% default rate. In 1989,

2

legislation was enacted causing NEC to face limitation, suspension or termination from the government's student loan program starting January 1, 1991 if it could not bring its default rate below 20%. NEC could not achieve that goal.

7.      By June 1994, NEC announced plans to discontinue the operations of its National Education Centers subsidiary after an extended period of attempting to restructure the business to operate in the increasingly restrictive regulatory environment. As a result of this decision, NEC recorded a loss on disposal of the Education Centers during the quarter ended June 30, 1994 in the amount of $40 million. CEC was founded in 1994 and grew rapidly as a result of a streak of some 26 acquisitions. In January 1995, NEC announced a letter of intent with CEC for the purchase of six Education Centers, contingent upon reaching agreement with the DOE on the school's student default rates.

8.      When the Company conducted an equity offering in 1998, the DOE questioned the Company's accounting in certain of its valuations as part of its review of CEC's financial responsibility. As a result, the Company was forced to provide additional information and make other changes, and combined with the offering, in order to receive a clearance from the DOE and the SEC in 1998.

9.      Throughout the Relevant Period, CEC publicly touted its business and financial performance and reported record results for FY:02 as well as for 1Q, 2Q and 3Q of FY:03. This stellar growth and record results were achieved by the Company's repeated reporting of increased student graduation and enrollment rates and thus its continuing ability to maintain accreditation and continue to qualify and receive state and federal funding.

10.     The truth behind defendants' "record" growth began to emerge on November 11, 2003

3

when *The Record*, a Bergen County, New Jersey newspaper, reported that a former director of Gibbs College, a school owned by CEC, had filed a lawsuit against the Company. The former director accused the Company of falsifying student records in order to show a high rate of student retention and graduation and to qualify for state and federal funding.

11.     On this news, CEC's stock plunged more than 13% or $7.10 per share on November 17, 2003 to close at $45.81 compared to the previous day's closing of $52.91, erasing more than $782 million in market capitalization. However, the Company's stock rebounded over the next few weeks as the market shrugged off the allegations in the lawsuit as isolated and unlikely to have a materially negative impact on CEC's overall operations, consistent with the Company's representations.

12.     However, on December 3, 2003, *The Santa Barbara News-Press* reported that another former employee at a school owned by CEC, Brooks Institute of Photography in Santa Barbara, had filed another lawsuit claiming that "officials at the school acted illegally and improperly to inflate enrollment and boost the bottom line." The former employee also alleged that "[m]any staff members have been asked by management to commit forgery, fraud, perjury or whatever else is necessary to pass audit inspectors."

13.     On this news, CEC's stock collapsed another 28% or $15.28 per share to close at $39.48 from the previous day's closing of $54.76, on extremely heavy trading volume of 18.2 million shares - more than nine times the Company's three-month daily average - and erasing another $1.68 billion in market capitalization.

14.     As a direct result of this illegal course of conduct, the Company is now the subject of numerous federal securities class action lawsuits filed in the United States District Court for the Northern District of Illinois, Eastern Division, on behalf of investors who purchased CEC's shares.

4

These lawsuits allege that investors purchased shares of the Company based on false and materially misleading statements regarding the financial condition of the Company and that they have been significantly damaged thereby. Specifically, those actions allege that defendants caused CEC to issue materially false and misleading statements during the Relevant Period because they failed to disclose and/or misrepresented the following adverse facts, among others: (1) that the Company's "record" financial growth was a product of inflated student enrollment, retention, and graduation rates procured through the falsification of such records; (2) that student records were falsified in order to show a higher rate of enrollment, student retention, and graduation so that the Company would qualify for state and federal funding; (3) that the Company, in order to procure its "record" financial results, forced employees to falsify student records; and (4) that the Company's earnings and net income were materially inflated and in violation of Generally Accepted Accounting Principles ("GAAP") because the Company's financial results were derived from the defendants' illegal practices.

15.     As a result of defendants' illegal misconduct, at all times during the Relevant Period, the defendants issued false and misleading financial statements and press releases concerning CEC's financial results that they knew, or should have known based on facts then available to them, were materially false when issued. The financial reports and projections issued by the Company during the Relevant Period, all of which implicitly and/or expressly were prepared in conformity with GAAP, were materially false and misleading because defendants caused the Company to overstate its earnings and financial condition.

16.     As a result of the defendants illegal activities and resulting false financial statements, the Company's stock traded at artificial levels during the Relevant Period. Company insiders took

advantage cashing out over 1 million shares of their personally held CEC stock during the Relevant Period at prices as high as $92.44 per share, reaping profits of over $75 million.

17.    On July 1, 2003, CEC announced it had acquired Whitman Education Group, Inc. ("Whitman") in a combination cash and share exchange transaction valued at $245 million. Defendants used the Company's artificially inflated stock price to complete the strategic acquisition of Whitman using CEC's common stock as acquisition currency, despite their knowledge that the Company's stock price was artificially inflated by their own improper misconduct, thereby further exposing the Company to millions of dollars in potential liability to Whitman's former shareholder(s).

18.    The negotiations surrounding the Whitman acquisition also illustrate the Board's knowledge and awareness of exactly how important and valuable CEC's reputation and its school's accreditation status and eligibility to participate in state and federal grants and loan programs was to the Company.  The change in ownership of a for-profit education company like Whitman presented an unusual regulatory challenge that was crucial to both sides in a transaction.  Defendants knew that Whitman's, as the target company, eligibility to participate in grant and loan programs under Title IV of the federal Higher Education Act would terminate with the closing of the sale to CEC.  CEC would then be forced to reapply to the DOE for the right to continue the company's participation in Title IV programs, and this continued participation would not be automatic and would be subject to regulatory scrutiny.  As a result, both sides in the deal were careful to construct an agreement to allocate the risk of liability that could have resulted should CEC's renewed bid for eligibility fail or be substantially delayed.  Whitman's eligibility to participate in federal grants and loan programs was one of its most important assets and the disclosures and the allocation of risk

6

were important terms the Board negotiated and were important in establishing the price the Company agreed to pay for the assets.

19.     A target company's track record plays an important role in the DOE's determination to issue a new program participation agreement. Under DOE regulations, the department will investigate the pre-sale operation of the company and compliance with DOE financial responsibility and other requirements. On the buy side, the department will check out the buyer's acquisition financing, its participation in Title IV and other government-funded programs through affiliated institutions, and compliance with DOE regulatory requirements. In light of the decree of risk, the CEC Board required that financial, operational, and legal due diligence be performed of all aspects of Whitman's compliance with Title IV and DOE regulations. But the seller(s) of Whitman also took a hard look at CEC's history to determine if CEC would present any risk of its own.

20.     Historically, it has been common in sales of education companies to escrow all or a portion of the purchase price until a new program participation agreement has been issued. The escrow is undesirable for a seller that has transferred control of its company without receiving any money but retained the risks that a new participation agreement will not be issued and the company will be adversely affected operationally or financially during the transition period. Because of CEC's history of regulatory problems, dating back to the NEC days, the seller(s) of Whitman would not agree to an escrow of the purchase price, CEC did not receive unwind rights, and Whitman did not have any indemnification obligations to CEC. In effect, CEC was required to bear the entire risk that a new program participation agreement would not be issued by the DOE.

21.     As drafted, the original sales contract the Board approved contained representations by Whitman that, to its knowledge, there was no fact pertaining to it or any of its schools that could

reasonably be expected to have a negative impact on CEC's ability to obtain a new agreement from the DOE. However, Whitman would not agree to the representation so it did not survive the closing of the transaction. Similarly, as originally drafted both Whitman and CEC had an obligation to use commercially reasonable efforts to assist each other in obtaining regulatory and accrediting body approvals. This covenant also did not survive the closing of the deal. The only protection CEC was able to obtain was that as a condition precedent to the Whitman acquisition, CEC could seek a summary review and written statement from the DOE that they did not see any impediment to the issuing of a Temporary Program Participation Agreement with respect to both institutions after the closing, something the DOE is not required to provide.

22.    The CEC Board's knowledge of the Company's earlier history of regulatory problems that directly jeopardized its standing with the DOE and its accreditation, including the problems experienced in the 1998 financing round, and then the negotiations over the allocation of risk of Whitman not qualifying for eligibility to participate in federal funding programs, put the members of the CEC Board on notice of the necessity maintaining compliance with federal and state rules permitting its institutions to participate in federal educational fund programs. Nonetheless, instead of implementing programs and policies to prevent the Company from engaging in the misconduct as alleged herein, violating the law and falling into non-compliance with regulations, defendants, under the domination and control of John M. Larson, either directly participated in or turned a blind eye to the lawlessness alleged herein, placing the Company and its assets in great peril.

23.    The Individual Defendants herein (as defined in ¶¶ 29-38), who are current and/or former directors and/or officers of CEC, participated in this conspiracy to obtain the financial and social benefits of such positions for themselves, to enrich and further the personal and business

8

interests of all defendants identified herein. The directors who did not sell stock during the Relevant Period participated by approving of CEC's improper financial reporting and facilitating the other defendants' insider trading and are unwilling to sue to recover the insider trading proceeds from their fellow Board members with whom they have extensive business, financial and personal relationships, as alleged herein. As a result of defendants' wrongful acts, the Company has suffered severe damage to its reputation, goodwill and its ability to conduct future operations, and has been exposed to millions of dollars in liability for violating accounting and federal securities laws.

## JURISDICTION AND VENUE

24. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that plaintiffs and defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a).

25. This action is not a collusive one designed to confer jurisdiction on a court of the United States which it would not otherwise have.

26. Venue is proper in the Court because nominal defendant CEC is headquartered in this District and thus a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District. One or more of the defendants either resides in or maintains executive offices in this District, and defendants have received substantial compensation in this District by engaging in numerous activities and conducting business here, which had an effect in this District.

## PARTIES

27. Plaintiff Scott McSparran, a resident of the State of Pennsylvania, is and was at

relevant times complained of herein, a shareholder of nominal defendant CEC.

28. Nominal defendant CEC is a Delaware corporation with its principal executive offices located at 2895 Greenspoint Parkway, Suite 600, Hoffman Estates, Illinois, 60195.

29. Defendant John M. Larson ("Larson") was, at all relevant times, Chairman of the Board of CEC, its President and Chief Executive Officer ("CEO"). Larson is a citizen of Illinois. As a director of CEC, Larson owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as President and CEO, Larson had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Larson owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Larson engaged in massive insider trading disposing of 300,000 shares for proceeds of $23,031,775. From 1980 to 1989, Larson was Vice President of Marketing at National Education Centers, Inc., a subsidiary of NEC. Defendant Keith K. Ogata ("Ogata"), from 1996 to 1998, served as President of National Education Centers, Inc., a subsidiary of NEC and from, 1990 to 1998, served as Vice President, Chief Financial Officer ("CFO") and Treasurer of NEC. Defendant Wallace O. Laub ("Laub") was co-founder of NEC where he served as Executive Vice President and a director from 1955 to 1993. In addition, defendant Robert E. Dowdell ("Dowdell") served as President of National Education Centers, Inc., a subsidiary of NEC from 1984 to 1988. From July 1993 until CEC's formation, Larson served as a consultant to Heller Equity Capital

10

Corporation ("HECC"), working with HECC to establish CEC. Defendant Thomas B. Lally ("Lally"), prior to his retirement in October 2001, was the President of HECC since August 1995, an Executive Vice President of Heller Financial, Inc. ("HFI") and Chairman of HFI's Executive Credit Committee since 1995 with direct responsibility for the asset quality oversight of HFI's portfolio of loan and equity investments. Defendant Patrick K. Pesch ("Pesch"), from 1992 until joining CEC, served as an officer of HECC. Thus, Larson has extensive long-term personal, financial and business relationships with the other members of CEC's management and Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

30.     Defendant Pesch was, at all relevant times, a director of CEC and its CFO, Treasurer, Executive Vice President and Secretary. Pesch is a citizen of Illinois. As a director of CEC, Pesch owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CFO, Treasurer, Executive Vice President and Secretary, Pesch had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company particularly, as CFO, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Pesch owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As CFO, Pesch was directly responsible for approving the Company's financial statements, so Pesch is a direct participant

11

in the wrongdoing. During the Relevant Period, Pesch engaged in massive insider trading disposing of 146,000 shares for proceeds of $11,206,400. From 1992 until joining CEC, Pesch served as a Senior Vice President of HFI and an officer of HECC. Pesch joined HFI in 1985 as head of the internal audit function and served in a number of positions, including senior credit officer for Heller Corporate Finance. From July 1993 until CEC's formation, Larson served as a consultant to HECC. Defendant Lally, prior to his retirement in October 2001, was the President of HECC since August 1995, an Executive Vice President of HFI and Chairman of HFI's Executive Credit Committee since 1995. Thus, Pesch has extensive long-term personal, financial and business relationships with Larson and other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

31.     Defendant Laub was, at all relevant times, a director of CEC and a member of its Compensation and Nominating Committees. Laub is a citizen of California. As a director of CEC, Laub owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Compensation and Nominating Committees, Laub had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Laub owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Laub engaged in massive insider trading disposing of 40,000 shares for

12

proceeds of $2,767,020. Laub was co-founder of NEC where he served as Executive Vice President and a director from 1955 to 1993. From 1980 to 1989, Larson was Vice President of Marketing at National Education Centers, Inc., a subsidiary of NEC. Ogata, from 1996 to 1998, served as President of National Education Centers, Inc., a subsidiary of NEC and, from 1990 to 1998, served as Vice President, CFO and Treasurer of NEC. In addition, Dowdell served as President of National Education Centers, Inc., a subsidiary of NEC from 1984 to 1988. Thus, Laub has extensive long-term personal, financial and business relationships with Larson and other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

32.     Defendant Ogata was, at all relevant times, a director of CEC and a member of its Nominating and Audit Committees. Ogata is a citizen of Hawaii. As a director of CEC, Ogata owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Nominating and Audit Committees, Ogata had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Ogata owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of CEC's Audit Committee, Ogata was directly responsible for approving the Company's

13

financial statements, so Ogata is a direct participant in the wrongdoing. During the Relevant Period, Ogata engaged in massive insider trading disposing of 28,500 shares for proceeds of $2,162,275. Ogata, from 1996 to 1998, served as President of National Education Centers, Inc., a subsidiary of NEC and, from 1990 to 1998, served as Vice President, CFO and Treasurer of NEC. Laub was co-founder of NEC where he served as Executive Vice President and a director from 1955 to 1993. From 1980 to 1989, Larson was Vice President of Marketing at National Education Centers, Inc., a subsidiary of NEC. In addition, Dowdell served as President of National Education Centers, Inc., a subsidiary of NEC from 1984 to 1988. Thus, Ogata has extensive long-term personal, financial and business relationships with Larson and other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

33.     Defendant Dennis H. Chookaszian ("Chookaszian") was, at all relevant times, a director of CEC and a member of its Audit Committee. Chookaszian is a citizen of Illinois. As a director of CEC, Chookaszian owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Audit Committee, Chookaszian had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Chookaszian owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his

fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of CEC's Audit Committee, Chookaszian was directly responsible for approving the Company's financial statements, so Chookaszian is a direct participant in the wrongdoing. Chookaszian is also a director of Marshall & Swift, L.P. Dowdell, from 1989 to the present, has served as CEO and a director of Marshall & Swift, L.P. Thus, Chookaszian has extensive long-term personal, financial and business relationships with other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

34.     Defendant Dowdell was, at all relevant times, a director of CEC and Chairman of its Compensation Committee. Dowdell is a citizen of California. As a director of CEC, Dowdell owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member and Chair of its Compensation Committee, Dowdell had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Dowdell owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Dowdell engaged in massive insider trading disposing of 61,900 shares for proceeds of $4,426,593.73. Dowdell served as President of National Education Centers, Inc., a subsidiary of NEC from 1984 to 1988. Ogata, from 1996 to 1998, served as President of National

Education Centers, Inc., a subsidiary of NEC and, from 1990 to 1998, served as Vice President, CFO and Treasurer of NEC. Laub was co-founder of NEC where he served as Executive Vice President and a director from 1955 to 1993. From 1980 to 1989, Larson was Vice President of Marketing at National Education Centers, Inc., a subsidiary of NEC. In addition, Dowdell, from 1989 to the present, has served as CEO and a director of Marshall & Swift, L.P. Chookaszian is also a director of Marshall & Swift, L.P. Thus, Dowdell has extensive long-term personal, financial and business relationships with Larson and other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

35.     Defendant Lally was, at all relevant times, a director of CEC and a member of its Nominating, Compensation and Audit Committees. Lally is a citizen of New York. As a director of CEC, Lally owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as a member of its Nominating, Compensation and Audit Committees, Lally had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company particularly, as a member of the Audit Committee, with respect to the Company's internal systems of accounting controls and procedures, and ensuring the Company's financial statements complied with GAAP. Rather than fulfill these important fiduciary duties Lally owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. As a member of CEC's Audit Committee, Lally was directly responsible

16

for approving the Company's financial statements, so Lally is a direct participant in the wrongdoing. During the Relevant Period, Lally engaged in massive insider trading disposing of 48,000 shares for proceeds of $3,353,285. Lally, prior to his retirement in October 2001, was the President of HECC since August 1995, an Executive Vice President of HFI and Chairman of HFI's Executive Credit Committee since 1995 with direct responsibility for the asset quality oversight of HFI's portfolio of loan and equity investments. From July 1993 until CEC's formation, Larson served as a consultant to HECC, working with HECC to establish CEC. Pesch, from 1992 until joining CEC, served as an officer of HECC. Thus, Lally has extensive long-term personal, financial and business relationships with Larson and other members of CEC's Board which would have impaired his ability to comply with his fiduciary duties and to independently consider a pre-suit demand on the CEC Board to bring this lawsuit.

36.     Defendant Nick Fluge ("Fluge") was, at all relevant times, President of CEC's Online Education Group. Fluge is a citizen of Illinois. As an officer of CEC, Fluge owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as President of CEC's Online Education Group, Fluge had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Fluge owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Fluge engaged in massive insider trading disposing of 104,000 shares for proceeds of $7,883,797.74.

37.     Defendant Jacob P. Gruver ("Gruver") was, at all relevant times, CEC's President, Colleges, Schools & Universities Group and Assistant Secretary. Gruver is a citizen of Illinois. As an officer of CEC, Gruver owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CEC's President, Colleges, Schools & Universities Group and Assistant Secretary, Gruver had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Gruver owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these wrongful acts or omissions. During the Relevant Period, Gruver engaged in massive insider trading disposing of 136,000 shares for proceeds of $10,239,383.61.

38.     Defendant Todd H. Steele ("Steele") was, at all relevant times, CEC's Executive Vice President of Strategic Planning & Development. Steele is a citizen of Illinois. As an officer of CEC, Steele owed a duty to the Company and its shareholders to be reasonably informed about the business and operations of the Company. Moreover, as CEC's Executive Vice President of Strategic Planning & Development, Steele had also assumed important managerial responsibilities at CEC which required him to be well informed about the day-to-day operations of the Company. Rather than fulfill these important fiduciary duties Steele owed to CEC and its shareholders he, upon information and belief, actively participated in or knowingly encouraged, sponsored or approved many of the wrongful acts or omissions complained of herein, and/or breached his fiduciary duties to CEC and its shareholders by purposefully, recklessly and/or negligently disregarding these

18

wrongful acts or omissions. During the Relevant Period, Steele engaged in massive insider trading disposing of 164,646 shares for proceeds of $10,596,443.10.

39.     The defendants identified above in ¶¶ 29-38 are collectively referred to hereinafter as the "Individual Defendants." For demand futility purposes, the defendants identified in ¶¶ 29-35, who make up the current Board of CEC are referred to as the "Director Defendants." The Defendants identified in ¶¶ 29-32 and 34-38 are referred to as the "Insider Selling Defendants."

## FACTS

40.     CEC is a provider of private, for-profit post-secondary education, with fifty-one campuses located throughout the United States, Canada, France, the United Kingdom and the United Arab Emirates. CEC also offers online programs through American InterContinental University-Online, its e-learning division.  The Company's schools offer master's degrees, bachelor's degrees, associate's degrees and diploma programs in career-oriented disciplines. CEC owns and operates schools in the following career-related fields: Visual Communications and Design Technologies, Information Technology, Business Studies, Culinary Arts, and Health Education.

41.     CEC's business is highly regulated by federal, state and private accrediting agencies, including ACICS and is crucially dependent on maintaining compliance with federal and state rules, and its accreditation and reputation with students and employers.

42.     Throughout the Relevant Period, the Company publicly touted its business and financial performance, the performance of its stock price and its industry leading position as reasons for why investors should purchase its stock.  For example, on a webpage titled "Why Invest in CEC?", the Company represented that it has "demonstrated operational excellence," enjoys a "strong competitive advantage," is "a growth leader in a growth market," and has "a graduate placement

record that consistently ranks among the industry leaders." Similar representations touting CEC's business and growth were included in the Company's press releases, SEC filings and conference calls.

43. The Company reported record results for FY:02 as well as for 1Q, 2Q and 3Q of FY:03. This stellar growth and record results were achieved by the Company's repeated reporting of increased student graduation and enrollment rates and thus its continuing ability to maintain accreditation and continue to qualify and receive state and federal funding.

44. Such representations were improper because they failed to disclose that CEC had been regularly falsifying student records in order to increase graduation rates and enrollment, conceal problems that could have threatened the accreditation of its schools, and generally, to allow it to increase its profitability. Among other things, CEC's schools graduated students who had not completed required courses and regularly credited and billed students for taking courses the students had never attended. Because many of CEC's students receive federal financial aid, the federal government footed tuition bills for courses not attended or passed by students, CEC improperly recognized and reported such payments as revenue. The strong growth reported by the Company throughout the Relevant Period was grounded in these improper practices, rendering CEC's reported historical financial performance and projections of future growth improper.

## IMPROPER STATEMENTS DURING THE RELEVANT PERIOD

### The First Quarter of 2003

45. The Relevant Period commences on January 28, 2003. On that day, the Individual Defendants caused the Company to announce "record results" for FY:02. CEC reported record net revenues, net income and student population in the fourth quarter and year ended December 31,

2002, it's 20th consecutive quarter of record results since becoming a public company. Fourth quarter 2002 net revenues were $219.7 million, up 42% from $155.2 million for the same period the previous year. Fourth quarter 2002 net income was $31.0 million, or $0.65 per diluted share, up 61% from the previous year's fourth quarter net income of $19.3 million, or $0.42 per diluted share. Full year 2002 net revenues were $751 million, up 42% from $529.2 million a year earlier. Full year 2002 net income was $67.5 million, or $1.42 per diluted share, up 76% from $38.4 million or $0.85 per diluted share.

46.     With respect to student enrollment, the Individual Defendants caused the Company to state that January 2003 new student starts rose 28% to approximately 10,550, up from approximately 8,250 for the same period the previous year. Fourth quarter 2002 new student starts rose 18% to approximately 13,100, up from approximately 11,100 for the same period the previous year. Total CEC student population on January 31, 2003 was expected to be approximately 51,100, up 21% from approximately 42,100 on January 31, 2002. On a same school basis, student population was expected to increase approximately 19%.

47.     Commenting on the Company's "record" result, defendant Larson on behalf of the Company stated:

> "Career Education Corporation had an outstanding 2002, achieving record growth and profitability in becoming the world's largest on-campus provider of private, for-profit post-secondary education in terms of revenue[.]"...
>
> "Organic growth was driven by same-school growth and new Orlando, Florida and Sunnyvale, California campus start-ups in our colleges, schools and universities group and by the same expansion of our on-line education group. Through acquisition, we also entered a field of health education, which will contribute significantly to continuing CEC's growth in 2003 and beyond[.]"

48.     On February 18, 2003, the Individual Defendants caused the Company to announce

21

that it had acquired Formastrat SA and its subsidiaries, also known as the INSEEC Group, an operator of nine post-secondary schools in Paris, Bourdeaux and Lyon, France. The acquisition was expected to be accretive to earnings in 2003.

49.     On March 2003, the Individual Defendants caused the Company to announce that it had filed a Form S-3 shelf registration statement with the SEC. The shelf registration covered the issuance, from time to time, of up to 300 million of common stock, preferred and debt securities. Once declared effective by the SEC, the shelf registration statement would enable the Company to raise funds from the public offering of any individual security covered by the shelf registration statement, as well as any combination of these types of securities, through underwriters, agents, dealers or by sales directly to purchasers, subject to market conditions and the Company's capital needs.

50.     Also on March 10, 2003, the Individual Defendants caused the Company to file it's Annual Report with the SEC on Form 10-K. The Company's Form 10-K was signed by defendants Larson, Pesch, Chookaszian, Dowdell, Lally, Laub and Ogata and reaffirmed its previously announced financial results and enrollment numbers. The Company's auditors represented the following:

> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of CAREER EDUCATION CORPORATION AND SUBSIDIARIES as of December 31, 2002, and the result of its operation and its cash flows for the year then ended, in conformity with accounting principles generally accepted in the United States.

51.     On March 11, 2003, the Individual Defendants caused the Company to file with the SEC a registration statement on Form S-3. The Company's Form S-3 was signed by defendants Larson, Pesch, Chookaszian, Dowdell, Lally, Laub and Ogata. Therein, the Company incorporated

its financial results in its March 10, 2003 Form 10-K. Additionally, the Company stated the following:

> We expect to use the net proceeds from the sale of the securities for general corporate purposes, including working capital, capital expenditures and repayment of existing debt. We may also use the net proceeds to fund acquisitions of other businesses. We will describe the use of the net proceeds from the sale of securities in the prospectus supplement for that offering. Pending their use, we may invest the net proceeds in short-term, interest bearing securities.

52.     On March 26, 2003, the Individual Defendants caused the Company to announce that it and Whitman had signed a definite merger agreement under which CEC would acquire all of the shares of Whitman for a combination of cash and CEC stock. The transaction would significantly enhance CEC's position in the rapidly-growing health education field. Under the terms of the agreement, Whitman's shareholders would receive $6.00 in cash and $8.25 in CEC common stock (for a combined consideration of $14.25) for each share of Whitman stock. The stock portion of the consideration was subject to adjustment based on CEC's average share price during a specified period to closing. The transaction enterprise value was expected to be approximately $230. CEC stated that it anticipated that the merger would be accretive to CEC's earnings per share in 2003.

53.     On April 22, 2003, the Individual Defendants caused the Company to issue a press release entitled "Career Education Corporation Posts Record First Quarter Results," marking its "21st consecutive quarter of record results since becoming a public company." The Company summarized its results for the first quarter of 2003 as follows:

> First quarter 2003 revenues were $245.6 million, up 39 percent from $176.3 million for the same period last year. First quarter 2003 net income was $19.2 million, or $0.40 per diluted share, up 61 percent and 54 percent, respectively, from first quarter 2002 net income of $12.0 million, or $0.26 per diluted share.

Defendant Larson, on behalf of the Company, touted CEC's results, attributing its seeming success

to the reputation of its schools and track record of finding jobs for students after graduation. In addition, Larson reiterated that the Company signed a definitive merger agreement to acquire Whitman earlier in the quarter, stating as follows in relevant part:

"Career Education Corporation had an outstanding first quarter, delivering outstanding organic growth and enhanced operating margins," said John M. Larson, Chairman, President and Chief Executive Officer. "We also completed a nine-campus acquisition in France with the INSEEC Group and announced a definitive merger agreement with Whitman Education Group, Inc. that will significantly enhance CRC's platform in health education."

"Our first quarter 2003 lead flow was up approximately 52 percent over the same period last year proving that our marketing message is effectively reaching an increasing number of high school graduates, young adults, career changers and international students," Mr. Larson said. "Students come to CEC schools because of the school's reputation for delivering a high quality education, demonstrated track record in job placement and exclusive focus on 21st century careers, including visual communication and design, IT, business, culinary arts and health education."

54. On May 13, 2003 the Individual Defendants caused the Company to file its quarterly report for the first quarter of 2003 with the SEC on Form 1O-Q (the "1Q:03 Report"). The 1Q:03 Report reiterated the financial information contained in the April 22, 2003 press release and was signed by defendants Larson and Pesch on behalf of the Company. In a section of the 1Q:03 Report titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results, stating as follows in relevant part:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 1O-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for a fair presentation have been included.

55. In the section of the 1Q:03 Report titled "Management's Discussion and Analysis of

Financial Condition and Results of Operations," the Company summarized its quarterly results as follows:

> Our revenue increased from $176.3 million during the three months ended March 31, 2002 to $245.5 million for the same period during 2003. In addition, our net income increased from $12.0 million during the first three months of 2002 to $19.2 million during the same period in 2003. For the three months ended March 31, 2003, income from operations increased $11.2 million or 57%, to $30.9 million during 2003 from $19.7 million for the same period during 2002. Income from operations as a percentage of revenue improved from 11.2% during the first three months of 2002 to 12.6% for the same period during 2003.

56.     In discussing the risks and uncertainties facing the Company, the 1Q:03 Report referred readers to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations-Risks Related to Our Business' in our Annual Report on Form 10-K/A for our fiscal year ended December 31, 2002." The Form 10-K/A purported to warn investors that the Company is subject to strict regulatory oversight by the DOE, stating in this regard, as follows:

> **Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business**
>
> *Failure of our U.S. schools to comply with extensive regulations could result in financial penalties, restrictions on our operations or loss of external financial aid funding.*
>
> We derive a significant portion of our revenue from U.S. federal student financial aid programs administered by the U.S. Department of Education. To participate in these programs, a U.S. institution must obtain and maintain authorization by the appropriate state agencies, accreditation by an accrediting agency recognized by the Department of Education, and certification by the Department of Education. As a result, our U.S. schools are subject to extensive regulation by these agencies. These regulations cover virtually all phases of our operations, including our educational programs, facilities, instructional and administrative staff, administrative procedures, marketing and recruiting, financial operations, including the payment of refunds to students who withdraw, and financial strength. These regulations also affect our ability to acquire or open additional schools, add new educational programs or change our corporate structure. The agencies that regulate

25

our operations periodically revise their requirements and modify their interpretations of existing requirements.

If one of our schools were to violate any of these regulatory requirements, we could suffer a financial penalty. A regulatory agency could also place limitations on our schools' operations or terminate the school's ability to grant degrees and certificates or their eligibility to receive federal student financial aid funds. We cannot predict with certainty how all of these requirements will be applied, or whether each of our schools will be able to comply with all of the requirements in the future.

## The Second Quarter of 2003

57.     On July 1, 2003, the Individual Defendants caused the Company to announce that it had acquired Whitman in a combination cash and share exchange transaction valued at $245 million. Under the terms of the offer, "Whitman's shareholders will receive $6.00 in cash and 0.138 shares of CEC common stock for each share of Whitman common stock." The Company's plan to acquire Whitman had been announced prior to the Relevant Period and was touted as an important strategic acquisition for CEC. In the July 1, 2003 press release defendant Larson stated on behalf of the Company that "[t]his strategic combination will allow us to significantly enhance our position in the rapidly-growing health education field, while further expanding our leadership in information technology and business studies."

58.     On July 22, 2003, the Individual Defendant caused the Company to issue a press release announcing its 22nd consecutive quarter of "record" results for the second quarter of 2003. The Company also announced a two for one stock split. The Company summarized its performance in the quarter and the first six months of 2003 as follows:

Second quarter 2003 revenues were $256.1 million, up 44 percent from $178.4 million for the same period last year. Second quarter 2003 net income was $19.6 million, or $0.40 per diluted share, nearly double last year's net income of $10.3 million, or $0.22 per diluted share.

For the six months ended June 30, 2003, revenues were $501.6 million, up 41 percent from $354.7 million for the same period last year. Net income for the first half of 2003 was $38.8 million, or $0.80 per diluted share, up 74 percent from $22.3 million, or $0.47 per diluted share.

Defendant Larson, on behalf of the Company, attributed the reported record results to the "excellent reputation" of CEC's schools, among other factors, stating as follows in relevant part:

"As the record second quarter and first half results demonstrate, 2003 is another defining year for Career Education Corporation," said John M. Larson, chairman, president and chief executive officer. "Every element of our multi-pronged growth strategy is working as we continue to deliver enhanced operating results.

\* \* \*

"We are achieving high organic growth rates as record numbers of high school graduates and adult students seek high quality career programs at all degree levels," Mr. Larson said. "CEC schools have excellent reputations in the high-demand career fields of visual communication and design, IT, business, culinary arts and health education. Our bread geographic reach, full range of degree options and targeted marketing programs make our educational programs highly accessible to motivated students looking to succeed in their career field."

59.     On August 13, 2003, the Individual Defendants caused the Company to file its quarterly report for the second quarter of 2003 with the SEC on Form 10-Q (the "2Q:03 Report"). The 2Q:03 Report reiterated the financial information contained in the July 22, 2003 press release and was signed by defendants Larson and Pesch on behalf of the Company. In a section of the 2Q:03 Report titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results, stating as follows in relevant part:

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management, all adjustments considered necessary for

27

a fair presentation have been included.

60.     In the section of the 2Q:03 Report titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company summarized its results for the quarter as follows:

> Our revenue increased from $354.7 million during the six months ended June 30, 2002 to $501.6 million for the same period during 2003 and from $178.4 million during the second quarter of 2002 to $256.1 million during the second quarter of 2003. In addition, our net income increased from $22.3 million during the first six months of 2002 to $38.8 million during the same period in 2003 and from $10.3 million during the second quarter of 2002 to $19.6 million during the second quarter of 2003. For the six months ended June 30, 2003, income from operations increased $26.3 million or 71%, to $63.3 million from $37.0 million for the same period during 2002. During the second quarter of 2003, income from operations increased $15.1 million or 87%, to $32.4 million from $17.3 million for the same period during 2002. Income from operations as a percentage of revenue improved from 10.4% during the first six months of 2002 to 12.6% for the same period during 2003 and from 9.7% during the second quarter of 2002 to 12.6% during the second quarter of 2003. A significant portion of our increases in revenue and income from operations and our improvement in income from operations as a percentage of revenue improvement during the three months and six mouths ended June 30, 2003 is attributable to the growth and continued maturation of AIU Online, whose operating margin percentage is higher than those of our campus-based schools.

61.     In discussing the risks and uncertainties that the Company is exposed to, the 2Q:03 Report referred readers to "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations-Risks Related to Our Business' in our Mutual Report on Form 10-K/A for our fiscal year ended December 31, 2002." The Form 10-K/A purported to warn investors that the Company is subject to strict regulatory oversight by the DOE, stating as follows regarding the matter:

> **Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business.**
>
> ***Failure of our U.S. schools to comply with extensive regulations could result in financial penalties, restrictions on our operations or loss of external financial aid***

28

*funding.*

We derive a significant portion of our revenue from U.S. federal student financial aid programs administered by the U.S. Department of Education. To participate in these programs, a U.S. institution must obtain and maintain authorization by the appropriate state agencies, accreditation by an accrediting agency recognized by the Department of Education, and certification by the Department of Education. As a result, our U.S. schools are subject to extensive regulation by these agencies. These regulations cover virtually all phases of our operations, including our educational programs, facilities, instructional and administrative staff administrative procedures, marketing and recruiting, financial operations, including the payment of refunds to students who withdraw, and financial strength. These regulations also affect our ability to acquire or open additional schools, add new educational programs or change our corporate structure. The agencies that regulate our operations periodically revise their requirements and modify their interpretations of existing requirements.

If one of our schools were to violate any of these regulatory requirements, we could suffer a financial penalty. A regulatory agency could also place limitations on our schools' operations or terminate the schools' ability to grant degrees and certificates or their eligibility to receive federal student financial aid funds. We cannot predict with certainty how all of these requirements will be applied, or whether each of our schools will be able to comply with all of the requirements in the future.

## The Third Quarter of 2003

62.     On October 21, 2003, the Individual Defendants caused the Company to report yet another quarter of "record" results, its 23rd record quarter as a publicly traded company. The Company summarized its performance for the third quarter and nine months of 2003 as follows:

Third quarter 2003 revenues were $315.7 million, up 60 percent from $197.2 million for the same period last year. Third quarter 2003 net income was $26.9 million, or $0.26 per diluted share, up 90 percent from last year's net income of $14.2 million, or $0.15 per diluted share. For the nine months ended September 30, 2003, revenues were $817.3 million, up 48 percent from $551.8 million for the same period last year. Net income for the first nine months of 2003 was $65.8 million, or $0.66 per diluted share, up 80 percent from last year's net income of $36.5 million, or $0.39 per diluted share.

Defendant Larson attributed the reported results to the Company's successful business plan,

stating as follows:

> "Career Education Corporation continues to deliver record results, with the third quarter serving as a clear demonstration of the vitality and scalability of our business model," said John M. Larson, chairman, president and chief executive officer. "Third quarter results were driven by significant revenue and profitability gains in our online business, continued strong organic growth in our on-campus operations, and better than expected results from the recently acquired, former Whitman and INSEEC campuses. All of these factors helped drive our quarterly margin improvement of 210 basis points year-over-year."

> "As the results demonstrate, CEC is delivering on all fronts," Mr. Larson said. "The growth of our online business continues to outperform expectations and was the primary contributor to our exceeding third quarter revenue and earnings guidance. Our Online Education Group generated approximately $44 million in revenues during the third quarter and is on course to generate more than $140 million in revenues in 2003. This estimate is significantly higher than our 2002 revenues of $20 million."

63. On November 13, 2003, the Individual Defendants caused the Company to file its quarterly report for the third quarter of 2003 with the SEC on Form 10-Q (the "3Q:03 Report"). The 3Q:03 Report reiterated the financial information contained in the October 21, 2003 press release and was signed by defendants Larson and Pesch on behalf of the Company. In a section of the 3Q:03 Report titled "Basis of Presentation," the Company represented that the financial information contained therein was prepared in accordance with GAAP and fairly presented the Company's results, stating as follows in relevant part:

> The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles for interim financial information and the instructions to Form 10-Q and Article 10 of Regulation S-X. Accordingly, they do not include all of the information and footnotes required by generally accepted accounting principles for complete financial statements. In the opinion of management all adjustments considered necessary for a fair presentation have been included.

64. In the section of the 3Q:03 Report titled "Management's Discussion and Analysis of Financial Condition and Results of Operations," the Company summarized its results for the quarter

as follows:

Our revenue increased from $551.8 million during the nine months ended September 30, 2002 to $817.3 million for the same period during 2003 and from $197.2 million during the third quarter of 2002 to $315.7 during the third quarter of 2003. In addition, our net income increased from $36.5 million during the first nine months of 2002 to $65.8 million during the same period in 2003 and from $14.2 million during the third quarter of 2002 to $26.9 million during the third quarter of 2003. For the nine months ended September 30, 2003, income from operations increased $47.5 million or 78%, to $108.8 million from $61.3 million for the same period during 2002. During the third quarter of 2003, income from operations increased $21.2 million or 87%, to $45.5 million from $24.3 million for the same period during 2002. Income from operations as a percentage of revenue improved tom 11.1% during the first nine months of 2002 to 13.3% for the same period during 2003 and from 12.3% during the third quarter of 2002 to 14.4% during the third quarter of 2003. A significant portion of our increases in revenue and income from operations and our improvement in income from operations as a percentage of revenue during the three and nine month periods ended September 30, 2003 is attributable to the growth and continued maturation of our Online Education Group, whose operating margin percentage is higher than that of our campus-based schools.

65.     In discussing the risks and uncertainties facing the Company, the 3Q:03 Report referred readers to, "the factors discussed under 'Management's Discussion and Analysis of Financial Condition and Results of Operations-Risks Related to Our Business' in our Annual Report on Form 10-K/A for our fiscal year ended December 31, 2002." The Form 10-K/A purported to want investors that the Company is subject to strict regulatory oversight by the DOE, stating as follows regarding the matter:

**Failure to Comply with Extensive Regulations Could Have a Material Adverse Effect on our Business**

***Failure of our U.S. schools to comply with extensive regulations could result in financial penalties, restrictions on our operations or loss of external financial aid funding.***

We derive a significant portion of our revenue from U.S. federal student financial aid programs administered by the U.S. Department of Education. To participate in these programs, a U.S. institution must obtain and maintain authorization by the appropriate state agencies, accreditation by an accrediting agency

31

recognized by the Department of Education, and certification by the Department of Education. As a result, our U.S. schools are subject to extensive regulation by these agencies. These regulations cover virtually all phases of our operations, including our educational programs, facilities, instructional and administrative staff; administrative procedures, marketing and recruiting, financial operations, including the payment of refunds to students who withdraw, and financial strength. These regulations also affect our ability to acquire or open additional schools, add new educational programs or change our corporate structure. The agencies that regulate our operations periodically revise their requirements and modify their interpretations of existing requirements.

If one of our schools were to violate any of these regulatory requirements, we could suffer a financial penalty. A regulatory agency could also place limitations on our schools' operations or terminate the schools' ability to grant degrees and certificates or their eligibility to receive federal student financial aid funds. We cannot predict with certainty how all of these requirements will be applied, or whether each of our schools will be able to comply with all of the requirements in the future.

66.    During the Relevant Period, CEC's website, in a page titled Why Invest in CEC?, touted the strength of CEC's competitive position, the strong performance of its stock price and the Company's favorable prospects for continued growth. In relevant part, the Company highlighted the following as reasons to invest in CEC:

CEC's growth prospects for the future remain bright for five key reasons.

>>CEC is a growth leader in a growth market. Employer demands for a better-educated workforce and societal and demographic trends are creating a larger pool of potential students. CRC is well positioned to benefit because its curricula prepare students for careers in fields where current and future demand is strong. These factors will enable CEC to continue setting the growth pace among providers of private for-profit post-secondary education.

>>CEC's multi-faceted growth strategy is a proven success. The company consistently has achieved annual internal growth exceeding its stated 20 percent target. Supplementing internal growth are CEC's 26 acquisitions to date, which have broadened the company's geographic scope and contributed to growth in both revenues and earnings.

>>CEC's demonstrated operational excellence creates a strong competitive advantage that is reflected in: marketing programs that continue to attract students

in record numbers from all segments of the potential student population; career-focused educational programs that prepare graduates for successful careers in attractive, high-growth fields; innovative retention programs that help make sure students complete their education; and a graduate placement record that consistently ranks among the industry leaders.

>>CEC's entry into the high-potential field of online education provides another avenue for future growth. AIU Online and CTU Online, Online CEC's Education Group, offers academic programs that capitalize on the full multimedia potential of E-learning and a groundbreaking virtual campus that provides students with a total online learning environment.

>>Offering a full range of educational options - associate, bachelor's, master's, and doctoral degrees and non-degree diploma and certificate programs - enables CEC to meet the educational needs of students throughout their lifetimes as they advance in their careers or make new career choices.

## THE TRUTH EMERGES

67.     The truth behind defendants' "record" growth began to emerge on November 11, 2003 when *The Record*, a Bergen County, New Jersey newspaper, reported that a former director of Gibbs College, a school owned by CEC, had filed a lawsuit against the Company. The former director accused the Company of falsifying student records in order to show a high rate of student retention and graduation, and to qualify for state and federal funding.

68.     On this news, CEC's stock plunged more than 13% or $7.10 per share on November 17, 2003 to close at $45.81 compared to the previous day's closing of $52.91, erasing more than $782 million in market capitalization. However, the Company's stock rebounded over the next few weeks as the market shrugged off the allegations in the lawsuit as isolated and unlikely to have a materially negative impact on CEC's overall operations, consistent with the Company's representations regarding the matter.

69.     However, on December 3, 2003, *The Santa Barbara News-Press* reported that another former employee at a school owned by CEC, Brooks Institute of Photography in Santa Barbara, had

filed another lawsuit claiming that "officials at the school acted illegally and improperly to inflate enrollment and boost the bottom line." The former employee also alleged that "[m]any staff members have been asked by management to commit forgery, fraud, perjury or whatever else is necessary to pass audit inspectors."

70.    On this news, CEC's stock collapsed another 28% or $15.28 per share to close at $39.48 from the previous day's closing of $54.76, on extremely heavy trading volume of 18.2 million shares - more than nine times the Company's three-month daily average - and erasing $1.68 billion in market capitalization. In addition, on December 5, 2003 CEC was downgraded by Harris Nesbitt Gerard.

71.    Commenting on the work environment at CEC and the pressure put on employees to meet the numbers, a December 4, 2003 article on *TheStreet.com* by Senior Writer Rebecca Byrne entitled "'Pressure Cooker' Culture Faulted Career Ed" stated in relevant part:

> *The obsession with "meeting the numbers" hasn't gone away, and for some companies it could be causing big problems.*
>
> Career Education plunged 19% Thursday after a 28% decline Wednesday on news that an employee at one of its schools filed a complaint alleging that officials forged signatures and tampered with student files in an effort to inflate enrollment and the company's profits.
>
> The firm has vigorously denied the claims, calling them potentially libelous, but some analysts are worried about Career Ed's "pressure cooker" work environment, which could have encouraged some employees to fudge numbers.
>
> *"Career Education's culture is extremely performance-oriented, which puts employees under tremendous pressure to make the numbers," said Bear Stearns analyst Jennifer Childe. "While that is part of the formula for company's success, it can obviously cause rogue employees to break the rules to meet their goals."*
>
> * * *
>
> *While trends in the education segment are no doubt positive, J.P. Morgan*

*analyst Bradley Safalow said the complaint "has created a degree of uncertainty about the integrity of Career Education's enrollment practices and the manner in which it has been able to sustain growth."*

*UBS Warburg analyst Kelly Flynn said she has spoken with former employees who believe that Career Education fosters a "pressure cooker" work environment. She also noted that the company has seen a rise in bad debt recently, which leads her to question the quality of enrollment growth.*

The complaint against Career Education, which was actually filed in September, comes from a former employee at the Brooks Institute for Photography in Southern California. A former employee of the company's Gibbs College in Montclair, N.J., also has filed a suit against the company on the grounds of wrongful termination.

"It now appears that this might be more than just a coincidence that two incidents of this nature have surfaced within the past month," Childe said.
If the allegations prove to be true, the school's accrediting body, the Accrediting Council for Independent Colleges and Schools (ACICS), has the power to revoke Brooks' accreditation through a formal review process, analysts say. That would prevent the school from offering federal grants and loans and effectively shut it down.

But most analysts believe this outcome is highly unlikely because it would penalize the students. Instead, pundits believe the school could be placed on probation and face heightened regulatory scrutiny. Even if the Brooks' school were to be closed, the impact on earnings would be small. The school represents roughly 3% to 4% of the firm's total sales and about 3 to 4 cents of earnings, analysts say.

The risk, however, is that the behavior is found to be widespread among the company's other schools. "While I have the utmost respect for management at Career Education and confidence in their quality control systems, when you have 78 schools, tens of thousands of students and thousands of employees and staff members, it's difficult to know with certainty what's going on in the deep trenches," said Alexander Paris, an analyst at Barrington Research.

*Paris said there is a "culture of growth" at Career Education and among the postsecondary education companies in general. "These have been star performers over the past three years, and with very few exceptions over the past 10 years," he said.*

## IMPROPER FINANCIAL REPORTING

35

72.     The Individual Defendants, particularly management and the members of the Audit Committee, were responsible for maintaining and establishing adequate internal controls for CEC and to ensure that the Company's financial statements were based on accurate financial information. According to GAAP, to accomplish the objectives of accurately recording, processing, summarizing, and reporting financial data, a corporation must establish an internal accounting control structure. Among other things, the Individual Defendants were required under GAAP, to:

(1)     Make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     Devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that −

(a)          Transactions are executed in accordance with management's general and specific authorization; and

(b)          Transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles.

73.     In addition, according to Appendix D to the Statement on Auditing Standards ("SAS") No. 55, management should consider, among other things, such objectives as: (a) making certain that "[t]ransactions are recorded as necessary ... to permit preparation of financial statements in conformity with generally accepted accounting principles ... [and] to maintain accountability for assets;" and (b) make certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

74.     According to SAS 55.13:

Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's

36

objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions.

75.     Due to the improper financial reporting during the Relevant Period, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

a.     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶10);

b.     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶34);

c.     The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement of Concepts No. 1, ¶40);

d.     The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

e.     The principle that financial reporting should provide information about an

enterprise's financial performance during a period was violated. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement of Concepts No. 1, ¶42);

  f. The principle that financial reporting should be reliable in that it represents what it purports to represent was violated. That information should be reliable as well as relevant in a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶58-59);

  g. The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶79); and

  h. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concept No. 2, ¶¶95, 97).

  76. Moreover, CEC's Audit Committee operates pursuant to a written charter which states: "The primary purpose of the Audit Committee ("Committee") of the Board of Directors ("Board") is to *assist the Board in fulfilling its oversight functions to the Company's stockholders, potential stockholders and the investment community relating to accounting, reporting practices, and the quality and integrity of the financial reports and other publicly disseminated financial information of the Company.*"

  77. In addition, the Audit Committee Charter provides, under the title "Risk Management

and Controls" that the Audit Committee must:

Risk Management and Controls

> (1) *Inquire of management and the Public Accountant about significant risks or exposures and assess the steps which management has taken to minimize such risks and monitor control of these areas.*

> (2) *Review with the Public Accountant and the Chief Financial Officer and Controller their findings on the adequacy and effectiveness of internal controls and their recommendations for improving the internal control environment. Particular emphasis shall be given to the adequacy of such internal controls to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.*

> (3) *Conduct private sessions with the Public Accountant, the Chief Financial Officer and Controller, financial management, and any other party or person so as to ensure that information is adequately flowing to the Committee.*

> (4) Review with the Chief Financial Officer and Controller the annual audit plan, significant findings from specific audits and the coordination of audit coverages with the Public Accountant.

> (5) *Periodically review with the Company's legal counsel any matters that could have a significant impact on the Company's financial statements, such as compliance with laws and regulation, litigation, and inquiries received from governmental agencies and regulators.*

> (6) Review and approve the appointment, replacement, reassignment, or dismissal of the Chief Financial Officer.

> (7) *Annually review with the officer responsible for financial aid and regulatory affairs the results of financial aid audits.*

> (8) *Periodically conduct private sessions with the officer responsible for financial aid and regulatory affairs to discuss significant financial aid issues.*

78. The Individual Defendants, particularly the Audit Committee, not only caused the

Company to violate GAAP, but also to violate its own Audit Committee Charter by failing to, among others, properly implement, review, and oversee: (i) the Company's financial statements and its financial reporting process; and (ii) the systems of internal accounting and financial control. The Individual Defendants, and particularly the Audit Committee, utterly failed to establish and maintain adequate internal controls for CEC to ensure that the Company's financial results were calculated and recorded in accordance with GAAP. In particular, the Individual Defendants, and particularly the Audit Committee in violation of its own Charter, utterly failed to establish and maintain "*such internal controls to expose any payments, transactions or procedures that might be deemed illegal or otherwise improper.*"

79.     The Individual Defendants' improper statements throughout the Relevant Period enabled the Insider Selling Defendants to dispose of over 1 million shares of their personally held CEC stock for illegal proceeds of over $75 million. The following chart summarizes the massive sales of the various Insider Selling Defendants during the Relevant Period:

| **Defendant** | **Shares Sold** | **Proceeds** |
|---|---|---|
| Dowdell | 61,900 | $4,426,593.73 |
| Fluge | 104,000 | $7,883,797.74 |
| Gruver | 136,000 | $10,239,383.61 |
| Lally | 48,000 | $3,353,285.00 |
| Larson | 300,000 | $23,031,775.00 |
| Laub | 40,000 | $2,767,020.00 |
| Ogata | 28,500 | $2,162,275.00 |
| Pesch | 146,000 | $11,206,400.00 |
| Steele | 164,646 | $10,596,443.10 |

| TOTAL | 1,029,046 | $75,666,973.18 |
|-------|-----------|-----------------|

80.     By issuing these improper statements, or acquiescing in their dissemination and publication, the Individual Defendants breached their fiduciary duties of loyalty and good faith, violated GAAP, violated the Company's own Audit Committee Charter, committed gross mismanagement, and abused their control of CEC, by knowingly, recklessly, willfully, intentionally, and/or in the absence of good faith:

a.      Causing CEC to engage in the willful violation of the federal securities laws and to thereby to engage in the breaches of fiduciary duties alleged herein;

b.      Failing to supervise adequately the financial and operational condition of CEC, specifically in regard to the operations of the Company during the Relevant Period; and concealing from the public the true facts regarding the same;

c.      Failing to adequately supervise the operations of CEC in a manner consistent with preventing deceptive practices such as the improper accounting complained of herein;

d.      Failing to supervise adequately the officers and employees of CEC and failing to ensure that they act with honesty and integrity in order to preserve and enhance CEC's reputation in the business community;

e.      Exposing CEC to potential liability of millions of dollars, as well as lost goodwill, as a result of their failure to adequately supervise CEC's operations and employees, and to prevent their illegal activity;

f.      Failing to institute legal action against those responsible for causing CEC to engage in the improper practices in violation of state and federal securities laws and thereby exposing CEC to liability and other financial injury resulting therefrom;

g.    Causing the Company to be liable for the defense and indemnification of those directors and officers responsible for exposing CEC to liability in the above-mentioned securities class actions and other actions;

h.    Failing to ensure that CEC's public filings conformed with the federal and state laws;

i.    Engaging in a fraud upon the investment community by drafting or disseminating or approving of the public dissemination of CEC's false financial statements and press releases and other public statements which were materially false and misleading and failed to disclose adverse information about, *inter alia*, the Company's true financial and operational condition and business prospects; and

j.    Failing to sue to recover the massive illegal insider trading proceeds obtained by Company insiders who traded on non-public, adverse information and for failing to institute insider trading policies to prevent the future usurping of corporate opportunities and insider trading.

81.    The Individual Defendants, as a result of the substantial financial benefits they received and continue to receive as a result of their positions at CEC, engaged in and/or aided and abetted and/or acquiesced in the wrongful actions complained of herein and resolved all conflicts of interest in favor of themselves in order to protect and preserve their positions with CEC and the financial benefits that flow therefrom.

82.    In order to facilitate and to attempt to conceal their wrongdoing, the Individual Defendants, and particularly the Audit Committee, have caused CEC to maintain an inadequate system of internal financial and accounting controls such that CEC's financial statements did not reflect the true condition of the Company.

83. As a result of the Individual Defendants' wrongful and illegal actions, including their abuse of control and participation in the improper scheme, defendants' violations of state and federal laws, and their failure to maintain a system of internal financial and accounting controls adequate to ensure that the financial statements issued by CEC were true and correct in all material respects, CEC has suffered considerable damage to, and drastic diminution in, the value of its assets, goodwill and reputation in the financial community.

84. CEC has and will continue to expend significant sums of money as a result of the illegal and improper actions described above. Such expenditures include but are not limited to:

a. Costs incurred as a result of settlements and judgments related to defendants' violation of state and federal laws;

b. Costs incurred to carry out internal investigations, including the hiring of independent counsel;

c. Costs and legal fees for defending CEC, its officers and its directors against private litigation arising from the illegal and improper conduct alleged herein.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

85. The conduct of CEC's directors and officers complained of herein involves a knowing and/or reckless, culpable violation of their obligations as corporate officers and directors, the absence of good faith on their part, and a reckless disregard of their fiduciary duties to the Company and its shareholders, in which they were aware or should have been aware of a risk of serious injury to the Company. As a result of the foregoing acts of gross mismanagement and breach of fiduciary duty, CEC has been damaged in excess of several millions of dollars.

86. The Individual Defendants, in derogation of their responsibilities to CEC, failed to

43

properly manage the affairs of CEC and its subsidiaries and failed to protect the interests of CEC and its shareholders. The Individual Defendants failed to adequately exercise control as required by law, failed in significant measure to fully inform themselves of the affairs of CEC and its subsidiaries, failed to adequately involve themselves in decision-making and failed to establish adequate internal controls over management and the affairs of CEC.

87.     The Individual Defendants owed to the Company the highest duty of loyalty and honesty, which requires, at a minimum, conducting the Company's affairs in a lawful manner. The Individual Defendants knowingly and/or recklessly and/or in the absence of good faith breached their fiduciary duties to CEC by, *inter alia*, failing to establish internal controls sufficient to insure that the Company's business was carried on in a careful manner and that its reputation and financial assets were preserved. The Individual Defendants further breached their fiduciary duties by failing to disclose to the Company and to its shareholders those facts and circumstances concerning the wrongful conduct complained of herein, which the Individual Defendants had a fiduciary duty to disclose. To discharge their duties to CEC and its shareholders, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial affairs of CEC and its subsidiaries. Specifically, they were required, among other things:

a.     To manage, conduct, supervise and direct the business and affairs of CEC and its subsidiaries in accordance with applicable law and the Company's charter and bylaws;

b.     To neither violate, nor knowingly and/or recklessly permit any officer, director, or employee of CEC to violate applicable federal laws, rules and regulations;

c.     To exercise reasonable control and supervision over the Company's officers

and employees;

d. To maintain a proper division of authority and responsibility among the Company's officers and directors so as to prevent the dominance of any officer or director in the conduct of its business and affairs;

e. To exercise reasonable care in evaluation of the prudence and soundness of policies and practices proposed to be undertaken by CEC;

f. To ensure that CEC did not engage in unsafe, imprudent, or unsound practices, and to become and remain informed as to how the Company and its subsidiaries and units were, in fact, operating;

g. Upon receiving notice or information of an unsafe, imprudent or unsound practice, to make a reasonable investigation in connection therewith, and to take steps to correct that condition or practice; and

h. To act in good faith, in the best interests of the Company, and with the care that an ordinary prudent person would have used under similar circumstances.

88. The Individual Defendants, acting directly or indirectly, have violated their duty to exercise management stewardship of the Company, in part by failing to provide adequate internal controls, as well as by failing to conduct CEC's business in a careful and prudent manner.

89. The Individual Defendants acting either directly or indirectly have failed to devise and maintain an adequate system of internal financial and supervisory controls sufficient to provide reasonable assurances that the Company's assets would be safeguarded, its transactions would be executed in accordance with management's general or specific authorization, its business would be conducted in a careful and prudent manner, and its financial results reported in accordance with

GAAP. As a result of the lack of such adequate controls, repeated wrongful and illegal acts have occurred which have been greatly detrimental to CEC.

90. As a direct and proximate result of these failures on the part of the Individual Defendants to establish adequate internal controls, and the other wrongful acts attributed to them herein, CEC has suffered damages as set forth herein and has been exposed to enormous potential liability.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

91. Plaintiff brings this action derivatively in the right and for the benefit of CEC to redress injuries suffered, and to be suffered, by CEC as a direct result of the breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. CEC is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

92. Plaintiff will adequately and fairly represent the interests of CEC in enforcing and prosecuting its rights.

93. Plaintiff is and was an owner of the stock of CEC during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

94. The current Board of Directors of CEC consists of the following seven individuals: Director Defendants Larson, Pesch, Laub, Ogata, Chookaszian, Dowdell and Lally. Plaintiff has not made any demand on the present Board of Directors of CEC to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons:

a.    As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the Director Defendants knew the adverse non-public information regarding the improper accounting.   While in possession of this material adverse non-public information regarding the Company, the following current members of the CEC Board participated in the illegal insider selling:

(i)    During the Relevant Period, Larson sold 300,000 shares of CEC stock for proceeds of $23,031,775.  Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

(ii)    During the Relevant Period, Pesch sold 146,000 shares of CEC stock for proceeds of $11,206,400.  Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

(iii)    During the Relevant Period, Laub sold 40,000 shares of CEC stock for proceeds of $2,767,020.  Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

(iv)    During the Relevant Period, Ogata sold 28,500 shares of CEC stock for proceeds of $2,162,275.  Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

(v)     During the Relevant Period, Dowdell sold 61,900 shares of CEC stock for proceeds of $4,426,593.73. Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile; and

(vi)    During the Relevant Period, Lally sold 48,000 shares of CEC stock for proceeds of $3,353,285. Because this defendant received a personal financial benefit from the challenged insider trading transactions, this defendant is interested and any demand upon him is futile;

b.      The Compensation Committee of the Board determines, after consulting with the CEO, establishes, authorizes and administers CEC's compensation policies, practices and plans for CEC's directors, executive officers and other key personnel. The Compensation Committee is comprised of Director Defendants Dowdell, Lally and Laub. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Dowdell, Lally and Laub. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on Director Defendants Larson, Pesch, Ogata and Chookaszian is futile;

c.      The principal professional occupation of Director Defendants Larson and Pesch are their employment with CEC, pursuant to which they received and continue to receive substantial monetary compensations and other benefits. Specifically, for FY:03, CEC increased defendant Larsons' base salary from $600,000 to $750,000 and defendant Pesch's base salary from $300,000 to $360,000. In addition, both Larson and Pesch are granted options to purchase CEC stock and are awarded significant bonuses. Accordingly, defendants Larson and Pesch lack independence

48

from Director Defendants Dowdell, Lally and Laub, who exert influence over defendant Larson and Pesch's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendants Larson and Pesch incapable of impartially considering a demand to commence and vigorously prosecute this action;

        d.        According to CEC's Proxy Statements filed with the SEC, Director Defendants Ogata, Chookaszian and Lally served on the Audit Committee during the Relevant Period. The Audit Committee is responsible for reviewing the activities of CEC's internal auditors and independent accountants. The Audit Committee evaluates CEC's organization and its internal controls, policies, procedures and practices to determine whether they are reasonably designed to: provide for the safekeeping of CEC's assets; assure the accuracy and adequacy of CEC's records and financial statements; reviews CEC's financial statements and reports; monitors compliance with CEC's internal controls, policies, procedures and practices; and receives direct compliance reports from CEC's internal auditors and General Counsel and from the independent accountants. Nonetheless, the Audit Committee recommended that the Board of Directors include the improper audited financial statements in CEC's filings with the SEC during the Relevant Period. By such actions, these defendants breached their duties by causing or allowing the improper financials described above. As a result of these defendants' breach of their duties, any demand upon them is futile;

        e.        The entire CEC Board of Directors and senior management participated in the wrongs complained of herein. CEC's directors are not disinterested or independent due to the following: Director Defendants Larson, Pesch, Laub, Ogata, Chookaszian, Dowdell and Lally served on the CEC Board during the Relevant Period. Pursuant to their specific duties as Board members,

each was charged with the management of the Company and to conduct its business affairs. Each of the above-referenced defendants breached the fiduciary duties that they owed to CEC and its shareholders in that they failed to prevent and correct the improper financials. Thus, the CEC Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected CEC to millions of dollars in liability for possible violations of applicable securities laws;

        f.     The Director Defendants of CEC, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from CEC's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

        g.     As detailed herein at ¶¶ 29-35, in order to bring this suit, all of the directors of CEC would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand. As set forth in particularity in ¶¶ 29-35, because a majority of the Director Defendants have long-term personal, professional and financial relationships with Larson and other Board members, a majority of the Director Defendants could not have adequately considered a demand to bring the allegations made herein rendering any such demand futile;

        h.     The acts complained of constitute violations of the fiduciary duties owed by CEC's officers and directors and these acts are incapable of ratification;

        i.     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were

made available and distributed to shareholders, authorized and/or permitted the issuance of various

of the improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus

could not fairly and fully prosecute such a suit even if such suit was instituted by them;

j.       Any suit by the Director Defendants to remedy these wrongs would likely

expose the Director Defendants and CEC to further violations of the securities laws that would result

in civil actions being filed against one or more of the Individual Defendants; thus, they are

hopelessly conflicted in making any supposedly independent determination whether to sue

themselves;

k.       CEC has been and will continue to be exposed to significant losses due to the

wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against

themselves or others who were responsible for that wrongful conduct to attempt to recover for CEC

any part of the damages CEC suffered and will suffer thereby;

l.       If the Director Defendants were to bring this derivative action against

themselves, they would thereby expose their own misconduct, which underlies allegations against

them contained in class action complaints for violations of securities law, which admissions would

impair their defense of the class actions and greatly increase the probability of their personal liability

in the class actions, in an amount likely to be in excess of any insurance coverage available to the

Individual Defendants. In essence, they would be forced to take positions contrary to the defenses

they will likely assert in the securities class actions. This they will not do. Thus, demand is futile;

and

m.      If CEC's current and past officers and directors are protected against personal

liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in

this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of CEC. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, plaintiff asserts, upon information and belief, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by CEC against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of CEC, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause CEC to sue them, since they will face a large uninsured liability.

95. Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board of Directors has failed and refused to seek to recover for CEC for any of the wrongdoing alleged by plaintiff herein.

96. Plaintiff has not made any demand on shareholders of CEC to institute this action since such demand would be a futile and useless act for the following reasons:

      a.    CEC is a publicly held company with approximately 100 million shares outstanding, and tens of thousands of shareholders;

      b.    Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

c.    Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

97.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

98.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold CEC common stock on the basis of such information.

99.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold CEC common stock.

100.    At the time of his stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of CEC common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

101.    Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT II

### Against All Individual Defendants for Breach of Fiduciary Duty

102. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

103. The Individual Defendants owed and owe CEC fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe CEC the highest obligation of good faith, fair dealing, loyalty and due care.

104. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

105. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

106. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, CEC has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

107. Plaintiff on behalf of CEC has no adequate remedy at law.

## COUNT III

### Against All Individual Defendants for Abuse of Control

108. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

109. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence CEC, for which they are legally responsible.

110. As a direct and proximate result of the Individual Defendants' abuse of control, CEC has sustained significant damages.

111. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

112. Plaintiff on behalf of CEC has no adequate remedy at law.

## COUNT IV

### Against All Individual Defendants for Gross Mismanagement

113. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

114. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of CEC in a manner consistent with the operations of a publicly held corporation.

115. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, CEC has sustained significant damages in excess of hundreds of millions of dollars.

116. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

117. Plaintiff on behalf of CEC has no adequate remedy at law.

## COUNT V

### Against All Individual Defendants for Waste of Corporate Assets

118. Plaintiff incorporates by reference and realleges each and every allegation contained

above, as though fully set forth herein.

119.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused CEC to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially millions/billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

120.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.    Plaintiff on behalf of CEC has no adequate remedy at law.

## COUNT VI

### Against All Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of CEC.

124.    Plaintiff, as a shareholder and representative of CEC, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by the Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.      Against all of the Individual Defendants and in favor of the Company for the amount

56

of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, abuse of control, gross mismanagement, waste of corporate assets and unjust enrichment;

B.     Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of CEC has an effective remedy;

C.     Awarding to CEC restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants including all ill-gotten gains from insider selling by the Insider Selling Defendants;

D.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 5, 2004.

PATRICK J. SHERLOCK
LAW OFFICE OF PATRICK J. SHERLOCK
11 South LaSalle Street
Suite 1600
Chicago, Illinois 60603
Telephone: (312) 683-5575
Fax: (312) 896-5784

GEORGE E. BARRETT
DOUGLAS S. JOHNSTON, JR.
TIMOTHY L. MILES
BARRETT, JOHNSTON & PARSLEY
217 Second Avenue North
Nashville, TN 37201
Telephone: (615) 244-2202
Fax: (615) 252-3798

BRIAN J. ROBBINS
MARC M. UMEDA
ROBBINS UMEDA & FINK, LLP
1010 Second Avenue
Suite 2360
San Diego, CA 92101
Telephone: (619) 525-3990
Fax: (619) 525-3991

Counsel for Plaintiff

## VERIFICATION

I, Scott McSparran, have read the Shareholder Derivative Complaint and know the contents thereof.  Based upon my discussions with and reliance upon my counsel, the Complaint is true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _27_ day of December, 2003.


SCOTT MCSPARRAN



# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

# Civil Cover Sheet

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Northern District of Illinois.

**Plaintiff(s):** Scott McSparran, derivatively on behalf of Career Education Corporation

County of Residence: Allegheny County, Pennsylvania

Plaintiff's Atty:     Patrick J. Sherlock
                    Law Office of Patrick J. Sherlock
                    11 South LaSalle Street, Suite 1600, Chicago, IL 60603
                    312-683-5575

**Defendant(s):** John M. Larson Patrick K. Pesch Wallace O. Laub Keith K. Ogata Dennis H. Chookasian

County of Residence: Cook County, Illinois       JAN – 6 2004

Defendant's Atty:

# 04C 0041

II. Basis of Jurisdiction:      **4. Diversity (complete item III)**      **JUDGE ANDERSEN**

III. Citizenship of Principal Parties (Diversity Cases Only)

                Plaintiff:-**2 Citizen of Another State**
                Defendant:-**1 Citizen of This State**

**MAGISTRATE JUDGE LEVIN**

IV. Origin :                      **1. Original Proceeding**

V. Nature of Suit:              **160 Stockholder Suits**

VI.Cause of Action:            **Shareholder derivative action for Breach of Fiduciary Duty and other relief**

VII. Requested in Complaint
         Class Action:**No**
         Dollar Demand:
         Jury Demand: **Yes**

VIII. This case **IS NOT** a refiling of a previously dismissed case.

Signature:     *[signature]*

Date:     1-5-04

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

In the Matter of

Scott McSparren, derivatively on behalf of Career Education Corporation,

John M. Larson, et al.

Case Number: **04C 0041**

**JUDGE ANDERSEN**

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Scott McSparren

MAGISTRATE JUDGE LEVIN

DOCKETED
JAN 6 2004

| (A) | (B) |
|---|---|
| SIGNATURE *Brian J. Robbins* | SIGNATURE *Marc M. Umeda* |
| NAME Brian J. Robbins | NAME Marc M. Umeda |
| FIRM Robbins, Umeda & Fink | FIRM Robbins, Umeda & Fink |
| STREET ADDRESS 1010 Second Ave., Suite 2360 | STREET ADDRESS 1010 Second Ave., Suite 2360 |
| CITY/STATE/ZIP San Diego, CA 92101 | CITY/STATE/ZIP San Diego, CA 92101 |
| TELEPHONE NUMBER 619-525-3990  FAX NUMBER 619-525-3991 | TELEPHONE NUMBER 619-525-3990  FAX NUMBER 619-525-3991 |
| E-MAIL ADDRESS robbins@ruflaw.com | E-MAIL ADDRESS umeda@ruflaw.com |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☐  NO ☑ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☑  NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ |
| (C) | (D) |
| SIGNATURE | SIGNATURE *George Barrett* |
| NAME Patrick J. Sherlock | NAME George Barrett |
| FIRM Law Offce of Patrick J. Sherlock | FIRM Barrett, Johnston & Parsley |
| STREET ADDRESS 11 South LaSalle St. Suite 1600 | STREET ADDRESS 217 Second Ave. North |
| CITY/STATE/ZIP Chicago, IL 60603 | CITY/STATE/ZIP Nashville, TN 37201 |
| TELEPHONE NUMBER 312-683-5575  FAX NUMBER 312-896-5784 | TELEPHONE NUMBER 615-244-2202  FAX NUMBER 615-252-3798 |
| E-MAIL ADDRESS psherlock@joycelaw.com | E-MAIL ADDRESS |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6205368 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR?  YES ☑  NO ☐ | MEMBER OF TRIAL BAR?  YES ☐  NO ☑ |
| TRIAL ATTORNEY?  YES ☑  NO ☐ | TRIAL ATTORNEY?  YES ☑  NO ☐ |
| DESIGNATED AS LOCAL COUNSEL?  YES ☑  NO ☐ | DESIGNATED AS LOCAL COUNSEL?  YES ☐  NO ☑ |