IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SCOTT MCSPARRAN and LAURA )
ULRICH, Derivatively On Behalf of )
CAREER EDUCATION CORPORATION )
)
Plaintiffs, )
) No. 04 C 0041
v. ) (Consolidated with 04 C 4778)
)
) Wayne R. Andersen
JOHN M. LARSON, PATRICK K. PESCH, ) District Judge
WALLACE O. LAUB, KEITH K. OGATA, )
DENNIS H. CHOOKASZIAN, ROBERT )
E. DOWDELL, THOMAS B. LALLY, )
NICK FLUGE, JACOB P. GRUVER, and )
TODD H. STEELE, )
)
Defendants, )
–and- )
)
CAREER EDUCATION CORPORATION, )
a Delaware Corporation, )
)
Nominal Defendant. )

## MEMORANDUM OPINION AND ORDER

This matter is before the court on the defendants' motion to reconsider our denial of their motion to dismiss the Complaint. For the reasons stated below, defendants' motion to reconsider is granted.

## BACKGROUND

Scott McSparran and Laura Ulrich (hereinafter collectively "plaintiffs") filed a Verified Shareholders' Consolidated Derivative Complaint ("Complaint") on behalf of Career Education Corporation ("CEC"), suing every member of CEC's Board of Directors and certain key officers.

The facts set forth herein are those alleged in the Complaint. We take the allegations set forth in the plaintiffs' Complaint as true, as we must in addressing a motion to dismiss. Much of plaintiffs' 75-page, 164-paragraph Complaint contains allegations we need not analyze at this stage in the litigation. Both parties have submitted facts beyond those alleged in the Complaint, many of which are not proper for us to consider at this juncture. However, we reach the decision laid out below based solely on the facts alleged in the Complaint.

CEC is a provider of private, for-profit post secondary education, with 51 campuses located throughout the United States, Canada, France, the United Kingdom, and the United Arab Emirates. In addition to its physical locations, CEC maintains an on-line presence through its e-learning division, American InterContinental University-Online. While CEC is formally incorporated in Delaware, plaintiffs maintain that CEC is headquartered in this District, which is also where a significant portion of the alleged wrongs and transactions the plaintiffs set forth in the Complaint occurred.

Plaintiffs claim that defendants violated their fiduciary duty and other laws resulting in damages to CEC of several million dollars in legal and other fees and a significantly diminished business reputation. The gravamen of plaintiffs' Complaint is that defendants artificially inflated CEC's stock price so that they could sell their holdings of CEC's stock at a higher price than the true value of the company would warrant. The plaintiffs allege defendants engaged in various instances of improper conduct to implement this scheme. Alternatively, the plaintiffs allege that, if defendants lacked knowledge of the alleged fraud at CEC, they were woefully inadequate in fulfilling their oversight duties.

Many of the plaintiffs' allegations are pled without reference to the specific time the alleged wrongs were perpetrated, the place they occurred, or the CEC employees engaged in the supposedly nefarious conduct. For example, the Complaint states that "One former Director of Admissions at one of the Career Education schools states he was ordered by the school comptroller to falsify student entrance exams in order to build the student population" and "At other [unspecified] schools upwards of 15% of the reported student body was overstated. . . ." The only particularized facts the plaintiffs pled were: 1) a wrongful termination lawsuit brought by a former director of a CEC school alleging the falsification of student records; 2) claims made by an ex-employee of a different CEC school alleging that enrollment figures were inflated; and 3) a class action complaint filed against CEC and an investigation initiated by the Securities and Exchange Commission ("SEC"), neither of which relied upon particularized new facts, but both of which unquestionably brought the previous allegations to the attention of the Board. The Complaint also contains allegations that only pertain to two defendants, both of whom allegedly had access to comparisons between accurate "non-scrubbed" data about financial packaging for each and every enrolled student and inaccurate "scrubbed" data that was reported to the public.

The Complaint also alleges that all defendants save one sold significant stock holdings while CEC's stock was artificially inflated by the false numbers reported by CEC. The Complaint lists the proceeds gained from each stock sale by individual defendants. According to the plaintiffs, defendants' disposed of 2.8 million shares of CEC stock for proceeds of over $136 million.

Also detailed in the Complaint are the ties between CEC's CEO and Chairman of the Board, and each and every other member of CEC's Board of Directors. While CEC's CEO and Chairman of the Board unquestionably had some degree of control over the compensation of officers of CEC,

3

the Complaint does not allege other business relationships that would allow him to control the compensation of outside directors. Instead, the Complaint refers to general social and business ties and mentions fees paid to the directors for their services.

## DISCUSSION

Before the Court is a shareholder derivative complaint. A derivative action is brought by individual shareholders on behalf of a corporation. However, a hallmark of corporation law is that directors, rather than shareholders, manage the business affairs of the corporation. *See, e.g.*, 8 Del. C. §141(a) ("The business and affairs of a corporation organized under this chapter shall be managed by or under the direction of a board of directors except as may otherwise [be provided]."). Derivative actions "impinge on the managerial freedom of directors. Hence, the [ requirement that a plaintiff demand that a company's board of directors bring suit prior to initiating their own action on behalf of the company] . . exists at the threshold, first to insure that a stockholder exhausts his intracorporate remedies and then to provide a safeguard against strike suits." *Aronson v. Lewis*, 473 A.2d 805, 811 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244, 253 (Del. 2000). Nevertheless, the requirement that a plaintiff pleading a derivative complaint must make a demand upon a corporation's board is excused when such a demand would be futile. *Heineman v. Datapoint Corp.*, 611 A.2d 950, 952 (Del. 1992) ("Equity will not require a useless act" and thus when "demand upon the board would be 'futile,' the demand requirement will be excused.")

In determining the plaintiffs' pleading requirements we will follow the Federal Rules of Civil Procedure. Pursuant to Federal Rule of Civil Procedure 12(b)(6), when deciding a motion to dismiss, the court must assume the truth of all facts alleged in the complaint, construing the

allegations liberally and viewing them in the light most favorable to the plaintiff. *Jones v. General Electric Co.*, 87 F.3d 209, 211 (7th Cir.1996); *Wilson v. Formigoni*, 42 F.3d 1060, 1062 (7th Cir.1994). However, the normally liberal pleading standards of the Federal Rules of Civil Procedure are heightened in this case by Rule 23.1, which requires a plaintiff to "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority and, if necessary, from the shareholders or members, and the reasons for the plaintiff's failure to obtain the action or for not making the effort." Fed. R. Civ. P. 23.1. Pleading with particularity means that a plaintiff must include "the who, what, when, where, and how: the first paragraph of any newspaper story." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). The defendants urge us to accept the pleading standards set forth in *Starrels v. First National Bank of Chicago*, 870 F.2d 168, 1171 (7th Cir. 1989), which they contend require that plaintiffs support the state of mind and knowledge of defendants with specific facts. While we agree with the general principle advanced by the defendants, we do not deem it applicable in this case. The Complaint contains alternative allegations; defendants either knew specific facts, or were ignorant of those facts due to an allegedly actionable lack of oversight. Accordingly, if the plaintiffs' claims are otherwise pled with particularity, the defendants' state of mind is adequately established.

## I. Demand Futility

Because CEC was incorporated under the laws of Delaware, we will apply Delaware law in determining whether plaintiffs are excused from making a demand upon CEC's Board of Directors prior to initiating a suit. We note that, although plaintiffs claim Illinois law applies, they correctly recognize Illinois case law follows Delaware case law in determining the proper tests for demand

futility. *In Re Abbott Laboratories Derivative Shareholders Litigation*, 325 F.3d 795, 803 (7th Cir. 2001) ("*In Re Abbott Labs*"). The Supreme Court of Delaware created a two-part test for demand futility in *Aronson v. Lewis*. Under this test, we ask whether "a reasonable doubt is created that: (1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgement." *Aronson*, 473 A.2d at 814. Plaintiffs assert two main grounds for demand futility: (i) the Board of Directors is dominated and controlled by CEC's CEO and Chairman of the Board; and (ii) a majority of the Board of Directors are interested in the outcome of this litigation because they face a substantial likelihood of liability for claims predicated on the fact their decisions were not protected by the business judgment rule. Given the allegations of the Complaint, the two-part test laid out in *Aronson* is distilled in the present case into questions of independence and interest.

### A. Independence of Directors

Delaware courts have noted that "[a]t bottom, the question of independence turns on whether a director is, *for any substantial reason,* incapable of making a decision with only the best interests of the corporation in mind. That is, the Supreme Court cases ultimately focus on impartiality and objectivity." *In re Oracle Corp. Derivative Litigation*, 824 A.2d 917, 938 (Del.Ch.2003), quoting *Parfi Holding AB v. Mirror Image Internet, Inc.*, 794 A.2d 1211, 1232 (Del.Ch.2001), *rev'd in part on other grounds,*817 A.2d 149 (Del.2002), *cert. denied,*538 U.S. 1032, 123 S.Ct. 2076, 155 L.Ed.2d 1061 (2003) (emphasis in original). However, "neither mere personal friendships alone, nor mere outside business relationships alone, are sufficient to raise a reasonable doubt regarding a director's independence." *Litt v. Wycoff,* No. 19083-NC, 2003 Del. Ch. LEXIS 23, 16 (Del. Ch. Mar. 25, 2003). Nor does the fact that directors receive directorial fees destroy their independence. *Grobow*

*v. Perot*, 539 A.2d 180, 188 (Del.1988), *overruled on other grounds by Brehm*, 746 A.2d at 253-54; *see also White v. Panic*, 793 A.2d 356, 366 (Del.Ch.2000) ("[T]he fact that each [director] is paid an annual retainer of $30,000 plus a fee of $1000 for each meeting attended and annual grants of stock options does not make them beholden to [the company's CEO].").

There is no substantial reason to question the independence of a majority of CEC's Board of Directors. Plaintiff has not put forth any allegations that outside directors have their salary set by any board member, or are otherwise financially dependent upon other directors. If mere social acquaintances and prior business relationships with other board members coupled with the receipt of directorial fees destroyed a board member's independence, few boards would have any independent members. While certain directors are officers of CEC and therefore have their salaries set by other directors, thereby eliminating their independence, the majority of the directors remain independent. We need not analyze each individual director's independence, as the assertions plaintiffs bring forth to argue that the outside directors (who make up the majority of the board) lack independence run contrary to Delaware law. No outside directors have their compensation controlled by, or are otherwise subject to a disqualifying influence with, inside directors.

### B.     Interest of Directors

In determining whether the defendants have an interest in the litigation that would render a demand upon them futile we look to whether the factual allegations in the Complaint "create a reasonable doubt as to the disinterestedness of the directors at the time the Complaint was filed." *Blasband v. Rales*, 971 F.2d 1034, 1048 (3rd Cir. 1992) (applying Delaware law). A reasonable doubt regarding a director's interest is raised when a corporate decision "will have a materially

detrimental impact on a director, but not on the corporation or the stockholders." *Rales v. Balasband*, 634 A.2d 927, 936 (Del. 1993). If plaintiffs' Complaint pleads facts that indicate a majority of CEC's Board of Directors face a "substantial likelihood" of personal liability, a demand upon the Board of Directors is futile. *Aronson*, 473 A.2d at 815.

Generally, board members are protected from individual liability by the business judgment rule, which provides a "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company. Absent an abuse of discretion, that judgment will be respected by the courts." *Aronson*, 473 A.2d at 812. Nevertheless, individual liability for directors can result from two possible contexts: (i) such liability can "follow from a board decision that results in a loss because that decision was ill advised [,] 'negligent,'" or intentionally adverse to the best interests of the company and (ii) that liability may "arise from an unconsidered failure of the board to act in circumstances in which due attention would, arguably, have prevented the loss." *In re Caremark International Inc. Derivative Litigation.* 698 A.2d 959, 964 (Del.Ch. 1996).

Despite numerous vague and generalized statements, there is no specifically pled "action" taken by the board in the instant case. Instead, the plaintiff must rely on the board's alleged failure to act in the face of allegations of wrongdoing by former employees. Therefore, we focus on the second part of the test laid out above, which establishes that a board's extreme indifference or failure to act may create individual liability for board members. *In re Caremark*, 698 A.2d at 970 ("a director's obligation includes a duty to attempt in good faith to assure that a corporate information and reporting system, which the board concludes is adequate, exists, and that failure to do so under

some circumstances may, in theory at least, render a director liable for losses caused by non-compliance with applicable legal standards.")

*In re Abbott Labs* was a case initially dismissed for failure to adequately plead demand futility. 325 F.3d 795. The plaintiffs in *Abbott* pointed to numerous instances of the FDA bringing serious complaints to the attention of the company that created a significant possibility that the FDA would force the company to cease manufacturing key products. The Seventh Circuit Court of Appeals reversed the District Court's dismissal and found that:

> [g]iven the extensive paper trail... concerning the violations [giving rise the derivative complaint] and the inferred awareness of the problems, the facts support a reasonable assumption that there was a 'sustained and systematic failure of the board to exercise oversight,' in this case intentional in that the directors knew of the violations of law, took no steps in an effort to prevent or remedy the situation, and that failure to take any action for [six years] resulted in substantial corporate losses.
> . . .

*Id.* at 809.

Our previous opinion recited much of the prior discussion and relied on *Abbott* to allow the Complaint to stand. However, we are now convinced that was a mistaken analysis. *Abbott* involved the failure of a drug company's board of directors to rectify problems repeatedly raised by the FDA. In the present action a complaint mirroring the allegations in *Abbott* would specifically allege repeated notices from the Department of Education identifying serious infractions at CEC schools and threatening to shut them down if action is not taken. However, the plaintiffs do not make such allegations. The only specific allegations in the current case are two instances of ex-employees making salacious claims that were repeated in a class action complaint and investigated by the SEC. If this gave rise to the type of extreme indifference and failure to act that *Abbott* says creates enough of a likelihood of board member liability to justify a finding of demand futility, any board of any

company with multiple operating units would constantly face liability. Two claims of misconduct by former employees at a large corporation do not establish a systematic lack of board oversight. Even if such claims give rise to class action securities fraud cases or government investigations, that does not alter the fact that the only allegations of misconduct come from two of thousands of current and former employees. To allow such claims to give rise to demand futility would significantly diminish the protections of the demand requirement for all large corporations, which are likely to have several lawsuits and employee claims pending at any given time. Not every lawsuit means a board was negligent in its oversight and not every government investigation means a company's board must relinquish control over litigation on behalf of the corporation.

Plaintiffs' Complaint contains two alternative allegations. Defendants were allegedly either active participants in a scheme to report false accounting of revenues and enrollment figures so that they could sell their holdings of CEC stock at inflated prices, or they failed to act in the face of evidence that should have prompted remedial measures. Either of these two scenarios could result in personal liability for the defendants. However, neither is established by two instances of fraud alleged by former employees.

Arguably, plaintiffs pled with particularity that a minority of the directors had in their possession comparisons between accurate "non-scrubbed" data about financial packaging for each and every enrolled student and inaccurate "scrubbed" data that was reported to the public. However, since this additional allegation does not apply to a majority of the directors, we need not consider it since demand futility arises only when a majority of the directors are interested in the outcome of the litigation. All other specifically pled allegations, which are discussed above, apply equally to all defendants so an individualized inquiry into each defendant's interests is not required. Simply

put, the particularized facts in the instant Complaint do not establish that a majority of CEC's directors face a substantial likelihood of personal liability.

## CONCLUSION

For all the foregoing reasons, defendants' motion to reconsider [63-1] is granted. The Complaint is dismissed. It is so ordered.

Wayne R. Andersen
United States District Judge

Dated: May 3, 2006